Caleb E. Mason, Esq. (State Bar No. 246653)
WERKSMAN JACKSON & QUINN, LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
cmason@werksmanjackson.com
Telephone: (213) 688-0460
Facsimile: (213) 624-1942

Attorneys for Plaintiff
JOEL SYDANMAA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES POLICE DEPARTMENT SERGEANT JOEL SYDANMAA,<br>　　　　　Plaintiff,<br>　　　vs.<br>LOS ANGELES POLICE DEPARTMENT; CHIEF MICHEL MOORE, in his individual and official capacities; DOES 1-10,<br><br>　　　　　Defendants. | **COMPLAINT for:**<br><br>**1. Retaliation for Exercise of First Amendment Rights, in Violation of 42 U.S.C. § 1983**<br><br>**2. Injunctive Relief**<br><br>**DEMAND FOR JURY TRIAL** |

　　　Plaintiff Joel Sydanmaa ("SGT. SYDANMAA"), an individual and decorated 24-year Los Angeles Police Department Sergeant, alleges as follows:

### JURISDICTION AND VENUE

　　1.　SGT. SYDANMAA brings this suit under the United States Constitution and 42 U.S.C. § 1983.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

1

COMPLAINT

2.   The acts alleged herein occurred in the Central District of California.  Venue lies in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391.

3.   The case should be heard in the Southern Division of this Court, at the Santa Ana courthouse, because the transactions and occurrences at issue herein took place at SGT. SYDANMAA's home in Orange County, California, and his damages were, are, and will continue to be suffered there.  Additionally, SGT. SYDANMAA suffers from cancer and undergoes extensive weekly treatment at medical facilities in Orange County, California.

**PARTIES**

4.   SGT. SYDANMAA is a sergeant in the Los Angeles Police Department ("LAPD" or "DEPARTMENT").  He has been employed by the Department for more than 24 years and.  He is, and at all times mentioned herein was, a resident of Orange County, California. He exercised his First Amendment rights in Orange County, California, and he suffered the present and future damages at issue in this case in Orange County, California.

5.   Defendant LAPD is an agency of this City of Los Angeles ("CITY" or "LOS ANGELES"), a municipality organized under the Constitution and laws of the State of California.  The LAPD's principal place of business is in this judicial district, at 100 W. 1st St., Los Angeles, CA 90012.

6.   Defendant MICHEL MOORE ("CHIEF MOORE"), an individual, is the LAPD Chief of Police.  He is the final policymaker for the DEPARTMENT, and is vested with the power and authority to make, approve, and execute DEPARTMENT policies and practices with respect to personnel and disciplinary matters.  He is sued herein in both his individual and official capacities.

7.  The actions, decisions, and/or failures to act at issue herein, taken by DEFENDANTS, were committed within the purpose and scope of the DEFENDANTS' official agency and/or employment relationships with one another, such that the CITY is legally responsible for all such acts and omissions.

8.  SGT. SYDANMAA does not know the true names and capacities of DOES 1 through 10, inclusive, and thus sues said Defendants by fictitious names.  SGT. SYDANMAA will identify the true names and capacities of DOES 1 through 10, inclusive, if and when they are ascertained. SGT. SYDANMAA is informed, believes, and thereon alleges that each of the fictitiously named Defendants is in some manner legally responsible for the occurrences alleged herein.

9.  SGT. SYDANMAA is informed and believes and alleges thereon that Defendants, and each of them, at all times mentioned herein, were the agents, employees, servants, and/or co-conspirators of the remaining Defendants.  SGT. SYDANMAA is informed and believes, and thereon alleges, that Defendants, and each of them, were the actual and/or ostensible agents of the remaining Defendants and were acting within the course and scope of said agency. Defendants shall be specified individually herein or referred to collectively as "Defendants."

## FACTUAL BACKGROUND

10.  SGT. SYDANMAA is a good cop.  He's devoted over 24 years of his life to the LAPD, received more than 120 commendations, and been awarded the Police Medal for Heroism.  He's devoted to his job, the people he protects, and the younger officers he mentors.  He fought through a potentially deadly cancer diagnosis, and instead of retiring, came back to his job and his city. In his 24-plus years with the DEPARTMENT, he's never done anything improper on the job. Yet he's now being disciplined for "misconduct" that consists of expressing his opinions, as a private citizen, while off-duty, on his personal social media

3

accounts, about matters of public concern.  And it's the particular viewpoint of his opinions that the LAPD is targeting, when those opinions run counter to the DEPARTMENT's preferred political stance.  The LAPD—which permits and encourages officers to have social media accounts, but still does not have a clear social media policy—has taken the position that an officer's off-duty social speech as a private citizen on matters of public concern can subject him to discipline, if his viewpoint doesn't slant the right way.  That is wrong, and it violates the Constitution.  A public employer may not discipline or retaliate against its employees for the content of their political speech as private citizens on matters of public concern.

11.   That rule has been the law for decades.  Yet the LAPD punished SGT. SYDANMAA for re-posting an Instagram post stating that Japan tightly restricts the practice of Islam; for writing that he did not think the allegations of sexual assault against Supreme Court Justice Brett Kavanaugh were credible; and for writing that rapper Nipsey Hussle glorified gang violence in his songs.   SGT. SYDANMAA made each of these statements as part of widespread public discourse on matters of public concern: he made the first post on November 14, 2015, the day after the ISIS terrorist attack in Paris; he made the second post during the Kavanaugh confirmation hearing; and he made the third post a week after Mr. Hussle's murder.

12.   SGT. SYDANMAA began his career as a police officer in 1996, when he was 23 years old.  Since then, he's devoted his life to protecting and serving the people of Los Angeles. His record in the DEPARTMENT has been exemplary, and the DEPARTMENT has awarded him 120 commendations and decorations over the course of his career.

COMPLAINT

13.  SGT. SYDANMAA is politically aware and engaged, and proud to be a participant in American democracy.  He believes deeply in the values of civic discourse and debate.  And he believes deeply in the importance of meaningful discussion, interaction, and understanding between police officers and the public. He believes that the relationships between police officers and the public will benefit greatly from mutual communication, including his "day in the life" perspective as a police sergeant.  He believes that people on both sides of our country's social and political divides can benefit from communicating and seeing one another's perspectives. His primary purpose was, as he put it, "humanizing the badge," or showing that "behind every badge, there's a heart."

## SGT. SYDANMAA'S SOCIAL MEDIA ACCOUNTS

14.  In or about October, 2012, SGT. SYDANMAA created an Instagram account ("Instagram Account") on which he discussed numerous topics relating to current events, politics, and social issues.  He posted his content on the Instagram Account from his home in Orange County, California.  At no time did the account or any of SGT. SYDANMAA's statements thereon ever purport to be official statements by the LAPD or statements in SGT. SYDANMAA's capacity as an LAPD officer.  SGT. SYDANMAA's statements on the account were always and entirely his personal views, opinions, and comments, in his capacity as a private citizen, on matters of public concern.  The Instagram Account's home page contains a prominent disclaimer stating expressly that the statements and opinions expressed are solely his personal opinions, and not those of any government agency.

15. In or about September 2008, SGT. SYDANMAA created a Facebook account, ("Facebook Account") on which he discussed numerous topics relating to current events, politics, and social issues.  He posted his content on the Facebook

Account from his home in Orange County, California.  At no time did the account or any of SGT. SYDANMAA's statements thereon ever purport to be official statements by the LAPD or statements in SGT. SYDANMAA's capacity as an LAPD officer.  SGT. SYDANMAA's statements on the account were always and entirely his personal views, opinions, and comments, in his capacity as a private citizen, on matters of public concern. The Facebook Account's home page contains a prominent disclaimer stating expressly that the opinions expressed are solely his personal opinions, and not those of any government agency.

16.  The accounts are referred to herein individually as the Instagram Account and the Facebook Account, and collectively as the "Social Media Accounts."

17.  The Social Media Accounts prominently displayed the following disclaimer: "Posts are MY views only and not representative of any law enforcement agency."

18.  SGT. SYDANMAA wrote and published his posts on his own time, and with his own resources, from his home in Orange County, California.  He never spoke or claimed to speak on behalf of or as a representative of the LAPD.

19.  Rather, he spoke as a citizen and a human being, one whose right to speak publicly on matters of public concern is fully protected by the First Amendment. He spoke openly about his profession and his experiences, as anyone America is allowed to do.  SGT. SYDANMAA has the same rights to engage in speech as anyone else; and he is not required to hide his identity or his job when he does so.

20.  Among the topics SGT. SYDANMAA discussed on the Social Media accounts were his cancer treatments, the unexpected kindnesses of strangers, the psychological strains of police work, and his love and respect for his colleagues. Over the past decade, he's written more than 1500 posts.  Most were "slice of life" posts, describing his daily experiences on and off the job.  Many were about his

battle with cancer.  Others were about politics and current events.  The following are representative examples of some of his posts:

21. **EXAMPLE 1**:

la_5_o I had no idea today was National Sandwich Day at @subway until the girl told me I was getting a 2nd, free sandwich to share with somebody else. Since my son (Subway's no. 1 fan) was 60 miles away in school, I knew who my next choice was.  This is Tony, and he's homeless.  He works harder than you or I do, everyday.  I met Tony about a year ago when a man was upset that Tony was taking cans and bottles out of his trash can on the street.  When I asked the homeowner if he'd prefer that Tony broke into his neighborhood's cars to try and make enough money to survive, his attitude was adjusted.  Tony's a good guy.  A war veteran.  He works every day, 8 hrs per day, gathering recyclables from the trash, the streets, the parks, ect.  Then he walks an hour to the recycling place - with his cart - and then spends another hour doing the recycling.  On a good day, he'll make about $40 bucks - enough to buy a meal and maybe, if enough is leftover, get a $30 motel room.  Today I gave Tony my extra sandwich and you'd have thought I had given him a new car. He smiled his big, mostly toothless grin and said that he'd be able to eat twice in one day.  That was my paycheck for today.  And imagine that - joy, simply from being able to have TWO meals in one day.  Sure, some homeless ppl created their own plight and are criminals, but others are just ppl, like you or me, who caught a few bad breaks in life.  My friend Tony is one of them.
Pay it forward whenever you're able to folks - trust me, it feels good. 💙 #police #thinblueline

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







COMPLAINT

22. **EXAMPLE 2:**

la_5_o I was driving around the other night at work when I noticed this woman walking, holding the hands of presumably her two small kids, a boy age 9 and a girl age 6.  It was late (2330), cold (48 degrees) and they were sort-of in an area in the middle of nowhere.

So I pulled alongside them and asked if everything was alright.  She replied that they had gone to see a movie and afterwards her car wouldn't start.  Her cell phone had also died during the movie so she had no means to call for help, so she was forced to walk home with her kids (about 12 miles). They had been walking about two hours and were about halfway.

Needless to say, I gave them a ride the rest of the way, let the kids turn on the siren, etc.

When I got to work the following evening there was a bundle of fresh tamales waiting for me, with a note that said: "After noticing the Chipotle bag in your police car last night, I thought you should try some real Mexican food.  And btw, Nico (her son) now wants to be a police officer.  God bless you Sergeant". Yep, hit me in the feels.  It was really nothing to me- literally 5 minutes out of my night.  But clearly it left an impression on them, and I treasure that.

It is always the right time to do, the right thing.

View all 516 comments

10

COMPLAINT

23. **EXAMPLE 3:**

la_5_o I did a traffic stop last night, which is pretty uncommon for me as a Sergeant.  I responded to the area of a Shots Fired radio call and noticed a car driving erratically.  It flipped a U-turn over a solid, double yellow and then rolled a couple stop signs as I was following it before I lit it up.  I figured there was a pretty fair chance it was involved in the shooting. Taking no chances I had the driver turn the car off and put his hands out the window as I approached.  I could see his arms were covered with tattoos, as well as the side of his neck that I could see in the side-view mirror (often commonplace amongst gang members). I asked him if he knew why I had pulled him over and he replied "yes, the way I was driving". I asked him if he was a gang member and he replied "I used to be". I asked him why he was driving like that and he replied "well, my child is sick and hungry so I was trying to get home quickly with her medicine and dinner". Sure enough, there was a bag on the passenger seat containing both.

COMPLAINT

I went back to my car and thought for a minute. I decided more good could be done, both in that moment and for the future, by giving him a warning rather than a citation. It was my call to make and in law enforcement it's referred to as "the spirit of the law". The guy was very surprised (and thankful) when I told him "no ticket". He said to me "man, I thought for sure you'd write me based on my past and the way I look". I told him, when I write a ticket, I first consider the violations that were committed, not the looks of the person who committed them.

The guy then went inside (the stop occurred in front of his apartment) and as I was clearing the call on my computer he came back outside holding Lucy.

Lucy is his 4 y/o daughter and he said to me "I just wanted you to meet her, Sarge". Spirit of the Law.

COMPLAINT

24. **EXAMPLE 4**:

**la_5_o** Becoming numb to most things that shock the senses of a normal person is just part of being the police.  But even after 20+ years in the streets, there are still 3 types of calls that tug on my heart: child abuses, animal abuses and making unexpected death notifications.

Last week I was tasked with informing an elderly couple that their only son had died unexpectedly.  It troubled me a lot and I was trying to think of an "easy" way to deliver the news.  There was no such thing.  As they answered the door I sort-of smiled a half-hearted smile and struggled getting the words out regarding the terrible news.

Then the most extraordinary thing happened: the old man, who was clearly heart-broken, hugged me and said softly "I know how difficult that must've been, and you did great.  I suppose I'll never forget what you've just told me, and you told me in the kindest, most heart-felt way possible.  I thank you for that". This kind, heart-broken old man cast his grief aside for a moment and instead was concerned about me. I will never, ever forget that lesson I was given in grace and humility in the face of his terrible grief 🙏🏼

View all 158 comments

COMPLAINT

25. **EXAMPLE 5:**

la_5_o In a couple months another birthday will come calling.  A lot has happened in my life the past 3+ years that hasn't allowed me to age gracefully:  my battle with Stage-4 Cancer that caused me to lose 70 pounds over 6 months and truly left my body broken:  from wicked Radiation Fibrosis in my neck, to a non-functioning thyroid (and all the fun that goes along with it) to now a diagnosis of Kidney Disease (thanks to chemotherapy). I look into the mirror sometimes and truly don't recognize the person I see compared to pre-cancer.  But mostly I just don't look into the mirror, because it's hard to accept sometimes what this terrible disease has taken from me.  Older, balder, grayer, weaker and wrinklier, all thanks to the immeasurable stress I've endured since October 2016.

Recently at work I was at a hospital on a call.  In an adjacent room was a 11 yo girl whose parents sheepishly asked me if I wouldn't mind saying hello to their daughter (she loves the police). Of course I said yes.

Ashleigh was having surgery the following morning and I couldn't help but notice a large scar (from a previous surgery) on her close-shaven head.  She was also connected to a variety of machines for a variety of reasons.

As we spoke, she eventually said to me "you're

COMPLAINT

looking at my scar, and all of this (motioning to the machines), aren't you?". I replied "yes I am, I'm sorry". What that 11 yo girl said to me next, I shall never forget: "don't feel sorry for me, all of this (again pointing to her scar and the machines) just reminds me of how strong I am and of all the things that have tried to take me down, but could not. Storms never last, Sarge". The next morning when I woke up and looked into my mirror, I didn't see an older, balder, grayer, weaker, wrinklier version of myself any longer.

Instead, I saw a Warrior.  To my new friend Ashleigh, thanks very much for the perspective, I won't ever forget you 💙 #stormsneverlast

View all 311 comments

COMPLAINT

26. **EXAMPLE 6**:

**Ia_5_o** Today I was receiving treatment at the Chemo Infusion Center for Polycythemia.

They have a policy where no one except patients are allowed in the center (due to COVID).

This is crazy because many ppl getting chemotherapy are very sick and need a caregiver/buddy/someone to be with them.

In walked Frank (and his wife). Frank was a grizzled-looking, 70-something y/o wearing a hat that said "USS Okinawa" on it.  I instantly liked him.

Frank got upset and confused when he was told his wife couldn't wait with him and said he didn't want to wait alone.  I told his wife (Helen) that I'd be happy to keep him company while we both waited - I figured he had some great stories (based on his hat).

Before I could even ask Frank about his hat, he asked me what I do.  I told him I'm a Police Sergeant and Frank replied "I don't really like cops."

Wasn't expecting that, haha.

For the next ten minutes Frank told me about every bad encounter he'd ever had with police.  The time the MP's locked him in the brig.  The time State Police wrote him a ticket and impounded his car.  The time University Police tuned up his son in a college bar fight.

Mercifully, they called me upstairs.  But three minutes later they called up Frank, and you guessed it, they sat him right next to me.  Oh boy.

Frank continued telling me how police had hit on his girlfriend once in front of him, how their sirens always wake him up at night and how they always congregate at the donut shop.

Finally (thankfully) my treatment was over and I said to Frank "take care Sir" to which he grumbled something.

As I started to walk away Frank said "hey kid" and stuck out his hand for a handshake.  Then he said "I may not really like police, but I sure do appreciate them.  You be safe out there, we need brave ppl like yourself."

COMPLAINT

27. **EXAMPLE 7:**



**la_5_o** On patrol this morning I came across a 7 y/o boy playing in his yard.  I asked him if he had wished his mom a Happy Mother's Day.  He said "yes" but then put his head down.  I asked him what was wrong and he replied that he had no money to get her a gift or a card, or even crayons or markers to make a card with.  I told him that his words were enough, and drove away. A few blocks later I passed a drugstore, and I decided to go in.  The kid's face when I came back with this card and crayons was my paycheck for today.  It may have cost me 7 bucks, but a bridge was built between that little man, his mother and the police that wasn't there yesterday.  It's about giving back, and paying it forward.  A VERY heartfelt Happy Mother's Day to ALL the moms out there, God Bless. #mothersday #charactercounts #payitforward #igers #fitfam #love #live #life #laugh #happy #smile #mom #mother

View all 96 comments

18

COMPLAINT

28. **EXAMPLE 8:**



**la_5_o** These aren't Democrats or Republicans.  They don't know what BLM is and they don't have any opinion on "social injustices." They're just kids, and they still love the police.  Moments like these still make it all worthwhile.  Thin Blue Line.

View all 146 comments

29.  SGT. SYDANMAA did not relinquish his right to think, care, and speak about politics and current events when he accepted a job as a police officer. However, the LAPD has on multiple occasions infringed on his First Amendment rights by officially disciplining him for his off-duty speech as a private citizen on matters of public concern.  Our Constitution forbids public entities from punishing their employees for private speech on matters of public concern.  SGT. SYDANMAA loves his job, his city, and his Department.  But he can no longer sit quietly while he is punished by the Department for his exercise of his First Amendment rights.

**The LAPD Fails to Implement a Clear, Consistent, and Constitutional Policy on Officers' Personal Social Media Use**

30. The LAPD still does not have a clear, consistent, and Constitutional policy regarding officers' personal social media use.  The Department continues to rely on vague guidance such as the February 27, 2008 *Legal Bulletin* (Vol. 32, Issue 1) titled "Limitations on a Police Officer's First Amendment Right to Freedom of Expression."

31.  That document states that on-duty statements and statements made in uniform may be regulated; that statements made purportedly in the name of the Department may be regulated; and that the use of an officer's title or position to endorse a commercial product or political candidate may be regulated. None of these restrictions apply to SGT. SYDANMAA's speech at issue here.

32.  Moreover, the document specifically states that "an officer has greater protection under the First Amendment and other laws when the officer is addressing a 'matter of public concern.'  'Matters of public concern' involve political or social matters or concern to the greater community…. As long as the officer is clear that he or she is speaking about his or her own views rather than

speaking on behalf of the Department, and as long as he or she is speaking truthfully, an officer can speak off duty in a public forum or to the media about 'matters of public concern.'"

33.  This, of course, is exactly what SGT. SYDANMAA did—to a "t".  SGT. SYDANMAA stated clearly and explicitly that his social media posts were solely his own personal views; he made his social media posts off duty, on his own time; and he spoke on matters of public concern.  Every single social media post included this disclaimer: "Posts are MY views only and not representative of any law enforcement agency."

34.  However, because the LAPD still does not have a specific social media policy for officers, officers like SGT. SYDANMAA are vulnerable to arbitrary, capricious, and viewpoint-motivated disciplinary actions.

35.  The LAPD takes the position as a matter of official custom, policy, and practice, that *any* social media speech by an off-duty officer may be punishable if it has a "nexus to the Department," while the concept of "nexus to the Department" is vague, arbitrary, and infinitely flexible, such that the LAPD may define *any* social media speech as having a "nexus to the Department" if the poster can be determined to be an LAPD officer—*even if* the officer states that the views expressed are his alone.

36.  For example, in the spring of 2020, during the height of anti-police protests in Los Angeles, the LAPD devoted considerable time and resources to disciplining SGT. SYDANMAA for saying on his Instagram account that Nipsey Hussle had long glamorized and popularized the kind of casual retaliatory gang-related violence that ultimately ended his life.  (As set forth below, Mr. Hussle was killed following a conversation with a casual acquaintance who was angered because Mr. Hussle insinuated that he had acted as a "snitch.")  SGT. SYDANMAA expressed

the political opinion that anti-police rhetoric and particularly violent anti-police rhetoric has negative effects on the very communities most beset with criminal violence.

37.  At the same time, numerous LAPD officers publicly expressed political opinions sympathetic to Black Lives Matter protests against the LAPD and other police departments, by, among other things, appearing at protests and kneeling with protesters while *on duty* and *in uniform*.  Many of these overtly political statements were made by members of the LAPD command staff, with the knowledge and approval of, and/or at the direction of, CHIEF MOORE.

38.  Indeed, on or about June 10, 2020, LAPD Commander Cory Palka appeared at a Black Lives Matter protest, kneeled in front of the crowd, bowed his head, then stood and raised a fist. Commander Palka explained his actions on television by stating that he wanted to "show that behind each badge is a working heart, a caring heart, an empathetic heart, that we're human beings who have families, who care about our city and our community and who want to serve."  He stated that he took these public actions expressing a particular political viewpoint "in hopes that it would be an expression of freedom of speech."

39.  At another rally, CHIEF MOORE kneeled at a Black Lives Matter protest, expressing a political opinion and viewpoint, while on-duty and in uniform.  He did this in response to a request from Los Angeles City Council President Nury Martinez that he "order" his officers to kneel at a Black Lives Matter protest at City Hall.  Councilmember Martinez conveyed this request to LAPD Deputy Chief Dominic Choi, who conveyed it to CHIEF MOORE.  CHIEF MOORE replied that while he would not order LAPD officers to kneel, he would "encourage" officers to kneel and "model the way" by kneeling himself.

COMPLAINT

40.  Kneeling at a Black Lives Matter protest is an act of political speech, expressing a particular political viewpoint.

41.  SGT. SYDANMAA attempted to call these senior Command Staff officers as witnesses at his Board of Rights hearing, but the Department would not permit him to do so.

42.  SGT. SYDANMAA believes that the Constitution requires that the LAPD permit him at least as much freedom of speech when he is *off*-duty to speak about political issues as the LAPD provides its command staff while they are *on*-duty. But because the LAPD does *not* do what the Constitution requires, this lawsuit is necessary.

43.  Whatever the practical import or merits of such expressive displays by these officers, it cannot be denied that they were expressions of a political viewpoint, made by on-duty officers, in uniform. The LAPD cannot constitutionally have it both ways: it cannot encourage and permit political speech by officers (and on duty officers, no less) expressing one viewpoint in a political debate, while disciplining and punishing political speech by officers (and off-duty officers, no less) expressing the *other* viewpoint in that political debate.

44.  Yet the LAPD, as a matter of official policy and practice, engaged in regularly and systematically by the Department, and ratified by CHIEF MOORE, the official policymaker, is to use the Department's disciplinary procedures to do precisely that: permit speech expressing the "right" political viewpoints, while punishing speech expressing the "wrong" political viewpoints.

45.  The decision to use the disciplinary process to discipline, deter, punish, and chill officers' speech based on its political viewpoint was a deliberate choice  made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

**The LAPD Wrongfully Disciplines Sgt. Sydanmaa for Engaging in Protected Speech, as a Private Citizen, About the Paris Shootings and Islamic Terrorism**

46.  On or about November 13, 2015, Islamic terrorists shot and killed residents, tourists and police officers in a coordinated attack in Paris, France.  It was the biggest news story in the world. SGT. SYDANMAA, like millions of other people, heard about it, thought about it, and read Internet commentary about it. While reading internet commentary, He saw an post on Facebook that was being widely shared at the time. The image was as follows:



Japan keeps Islam at bay by putting restrictions on Islam and ALL Muslims.

- Japan is the only nation that does not give citizenship to Muslims
- Permanent residency is not given to Muslims
- Propagation of Islam in Japan is banned
- In the University of Japan, Arabic or any Islamic language is not taught
- Japan is the only country in the world with negligible number of embassies in Islamic countries
- One cannot import a 'Koran' published in the Arabic language
- Muslims must follow Japanese Law and language
- The Japanese government is of the opinion that Muslims are fundamentalist, and unwilling to change their Muslim laws
- Muslims cannot even rent a house in Japan
- There is no Sharia law in Japan

COMPLAINT

47.  SGT. SYDAMNAA thought the post (the "Japan Post") was interesting, and worthy of further discussion.  He is not an expert on Japanese law or culture, but he knew that unlike many other countries, Japan has not been the target of radical Islamic terrorist attacks.  He hoped to engage in discussions about an issue of obvious grave public importance.  On or about November 14, 2015, SGT. SYDANMAA re-posted the Japan Post on his Instagram page.

48.  On November 17, 2015 two employees of the Council on American-Islamic Relations ("CAIR"), Hussam Ayloush and Harron Manjlai, wrote a letter to LAPD Chief Charlie Beck.  They said that "it has come to our attention" that the "la_5_o" Instagram account had re-posted the Japan Post, and they demanded that Chief Beck "identify and discipline the officer who is the owner of the aforementioned social media account."  The complainants did not know who the account belonged to; did not suggest that the account purported to be or appeared to be statements of the LAPD; or was anything other than what it was: the private speech of a citizen on matters of public concern.

49.  Ironically, the complainants wrote that they "respect everyone's right to free speech."  Apparently, however, this respect did not extend to the free speech of off-duty police officers, on their own time, speaking on their private social media accounts on matters of great public concern, because the complainants demanded that whoever posted the statement be "identified and disciplined," because the posting included "inaccurate and false statements," and that they, the complainants, believed that the posting "conflates Islam and all Muslims with the terrorist attacks in Paris and ISIS."

50.  In sum, the complaint was specifically directed to the political viewpoint of SGT. SYDANMAA's post.  The LAPD investigated and determined that the Instagram account was SGT. SYDANMAA's private account.  At that point, the

complaint should have been closed out as unfounded, because the action Mr. Ayloush and Mr. Manjlai complained of was paradigmatically protected speech under the First Amendment. The issue of violence carried out by individuals radicalized by extreme religious ideologies is one of great public importance, was the subject of widespread public discussion around the time of the posts, and continues to be widely discussed in public discourse. The Constitution guarantees SGT. SYDANMAA the right to speak about that issue as a private citizen, free of restraint, discipline, or retaliation by his public employer. And it is undisputed (though Mr. Ayloush and Mr. Manjlai neglected to mention the fact in their letter) that the post, like all SGT. SYDANMAA's posts, included his standard disclaimer: "Posts are MY views only and not representative of any law enforcement agency."

51. The LAPD initiated its disciplinary process against SGT. SYDANMAA. SGT. SYDANMAA defended himself, asserting his constitutional right to speak while off-duty as a private citizen on matters of public concern on his private social media account. The Department initially proposed a penalty of a 22-day suspension without pay. SGT. SYDANMAA contested the penalty through the Department's internal procedures. He was at that time battling severe cancer, and was extremely ill and weak, and his medical issues prevented him from fully participating in the proceedings, so he ultimately accepted a reduced penalty of an official reprimand.

**The LAPD Wrongfully Disciplines Sgt. Sydanmaa for Engaging in Protected Speech as a Private Citizen, About the Confirmation Hearings of Justice Brett Kavanaugh**

52. In the fall of 2018, the confirmation hearing for Supreme Court Justice Brett Kavanaugh was among the biggest news stories in the nation. Millions of people discussed the hearings, in particular the allegations that Justice Kavanaugh

had sexually assaulted one or more young women when in high school or college. On September 26, 2018, at the height of these public discussions, SGT. SYDANMAA posted the following comment on his personal Facebook page, analyzing the evidence presented regarding these allegations.  He wrote:

> Those of you who know me know I'm a fairly opinioned person.  However, at work and in uniform, I'm not allowed to be (and rightfully so). I'm going to write the remainder of this post as if I'm in uniform, aka "just the facts."  Judge Kavanaugh's latest accuser, Julie Swetnick, claims that at a party in 1982 she saw Kavanaugh lined up outside a room waiting his turn where inside a woman was being gang raped. She says women were routinely drugged at these parties so that men could gang or train-rape them. She did not call the police. Instead, despite being aware of alleged drugging and gang rapes of women at these parties, Swetnick continued to attend such parties, at least six additional times, until she herself was allegedly gang raped at one as well. Swetnick does not accuse Kavanaugh in her case, and in fact she never identified any suspects and no arrest were ever made. Furthermore, no victim ever came forward with any case in the instance where she says she saw Kavanaugh "waiting his turn."  The second accuser is named Deborah Ramirez.  Her allegation is that Kavanaugh might have exposed himself to her at a party 30+ years ago.  She admits that she's not sure if it was Kavanaugh or not, that she was drunk and had black-

27

out periods during the party. All of their mutual acquaintances at the time recall nothing of said incident and say it would have been completely out of character for Kavanaugh to act as accused.  The first accuser, Christine Blasey Ford, says Kavanaugh groped her and tried to remover her top 36 years ago, when they were both minors in high school.  She cannot remember exactly where or when it occurred.  She didn't report it for 36 years and then only a week before Kavanaugh's confirmation hearing.  Nobody, including witnesses she claimed would back up her accusation, will confirm her account.  The therapist notes she says detail the claim don't mention Kavanaugh by name and differ wildly from the account that she's come forward with.  Oh and finally, her lawyer has been seen with none other than Hillary Clinton.  Everything I've just written are the FACTS. Not spins from Fox News, CNN, Breitbart, the Washington Post, the New York Times, Jimmy Kimmel, Hannity, etc.  Reach your own conclusions as to the merit of these allegations against Kavanaugh.  One other fact: in the United States the very premise of an American justice is that you're innocent until proven guilty.  Considering these circumstances, there's no way that Kavanaugh can be proven guilty.  Sooooo?

53.  Here is his post:

"Those of you who know me know Im a fairly opinionated person.
However, at work and in uniform, Im not allowed to be (and rightfully so). I'm going to write the remainder of this post as if Im in uniform, aka "just the facts". Judge Kavanaughs latest accuser, Julie Swetnick, claims at a party in 1982 she saw Kavanaugh lined up outside a room "waiting his turn", where inside a woman was being gang-raped. She says women were routinely drugged at these parties so that men could gang or "train" rape them. She did not call the police. Instead, despite being aware of alleged drugging and gang-rapes of women at these parties, Swetnick continued to attend such parties, at least six additional times, until she herself was allegedly gang-raped at one as well. Swetnick does not accuse Kavanaugh in her case, and in fact she never identified any suspects and no arrests were ever made. Furthermore, no victim ever came forward with any case in the instance where she alleges she saw Kavanaugh "waiting his turn". The second accuser is named Deborah Ramirez. Her allegation is that Kavanaugh might've exposed himself to her at a party 30+ years ago. She admits that she's not sure if it was Kavanaugh or not, that she was drunk and that she had black-out periods during the party. All of their mutual acquaintances at the time recall nothing of said incident and say it wouldve been completely out of character for Kavanaugh to have done as accused. The first accuser, Christine Blasey Ford, alleges Kavanaugh groped her and tried to remove her top 36 years ago, when they were both minors in high school. She cannot remember exactly where or when it occurred. She didn't report it for 36 years and then only a week before Kavanaugh's confirmation hearing. Nobody, including witnesses she claimed would back up her accusation, will confirm her account. The therapist notes she says detail the claim dont mention Kavanaugh by name and differ wildly from the account that she's come forward with. Oh and finally, her lawyer has been seen with none other than Hillary Clinton. Everything Ive just written are the FACTS. Not spins from Fox News, CNN, Breibart, the Washington Post, the New York Times, Jimmy Kimmel, Hannity, etc. Reach your own conclusions as to the merit of these allegations against Kavanaugh. One other fact: in the United States the very premise of American justice is that you're innocent until proven guilty. Considering these circumstances, there's no way that Kavanaugh can be proven guilty. Sooooooo....?"

54.  SGT. SYDANMAA's summary of the public allegations made by Judge Kavanaugh's three accusers was accurate.  Nothing in the post violated any LAPD norms or policies.  Moreover, SGT. SYDANMAA wrote and published the post, as with all his posts, on his own time, while off-duty, from his own home, as a private citizen speaking on a matter of public concern.

55.  An anonymous complainant filed a complaint about the post, alleging that SGT. SYDANMAA was "actively engaging in the shaming of multiple women who came forward with allegations."

56.  The complainant also complained about comments and images posted by *other* people, *not* SGT. SYDANMAA, in response to his Facebook post.

57.  The LAPD initiated its disciplinary process against SGT. SYDANMAA. SGT. SYDANMAA defended himself, asserting his constitutional right to speak while off-duty as a private citizen on matters of public concern on his private social media account.  Nonetheless, the Department disciplined him on or about December 4, 2019, imposing an Official Reprimand.

**The LAPD Wrongfully Disciplines Sgt. Sydanmaa for Engaging in Protected Speech as a Private Citizen, About the Murder of Nipsey Hussle**

58. On or about March 31, 2019, the rapper Nipsey Hussle was murdered.  A grand jury indicted a man named Eric Holder as the murderer.

59.  According to the indictment, testimony, and news accounts, the murder occurred as follows.  Mr. Holder, who had a history of violence and criminal conduct and was affiliated with one or more criminal gangs, was with his girlfriend near a business Mr. Hussle owned, and saw Mr. Hussle outside, speaking to a group of people.  Mr. Holder and his girlfriend approached Mr. Hussle and asked to take photos with him. Mr. Hussle agreed.  While they were talking, Mr. Hussle looked at Mr. Holder and said, "Cuz, have you ever snitched?"  Mr. Holder interpreted this question as an allegation that he, Mr. Holder, had engaged in "snitching," or acting as a police informant.  He grew angry and decided to kill Mr. Hussle.  He walked to a nearby restaurant to get lunch, ate it in his girlfriend's car, then returned to the store, approached Mr. Hussle, shot him 10 times, and then kicked him in the head.

//

//

60.  The murder was the biggest news story in Los Angeles that week.  SGT. SYDANMAA commented about it on his Instagram page on April 8, 2019.  He wrote:

> A lot of chaos here in LA recently over the murder of rapper Nipsey Hussle.  Whereas any murder is tragic and should've never occurred, I've seen a lot of misinformation regarding the victim himself.  He was a criminal gang member of the notorious Rolling '60s Crips, an organization that has wreaked havoc and violence upon Los Angeles for decades, including thousands of murders, tens of thousands of violent crimes and assaults upon its police officers too numerous to count.  I do feel badly for his family, loved ones, and even his fans for their loss, but let's not portray Mr. Hussle to be something that he was not.  While he may recently have participated in various ventures for the betterment of portions of his community and the children who live within it, he also perpetuated the criminal gang lifestyle and the anti-police sentiment in this country with his far-reaching song lyrics and images such as these.  The bottom line is that he chose the lifestyle that ultimately killed him and it wasn't the "great guy" lifestyle that so many ppl are making it out to be now that he's gone."

31

COMPLAINT

61.  Here is the post:



> **Liked by jkidd2786 and 8,373 others**
>
> **la_5_o** A lot of chaos here in LA recently over the murder of rapper Nipsey Hussle.  Whereas any murder is tragic and should've never occurred, I've seen a lot of misinformation regarding the victim himself.  He was a criminal gang member of the notorious Rolling 60's Crips, an organization that has wreaked havoc and violence upon Los Angeles for decades, including thousands of murders, tens of thousands of violent crimes and assaults upon its police officers too numerous to count.  I do feel badly for his family, loved ones and even his fans for their loss, but let's not portray Mr. Hussle to be something that he was not.  While he may recently have participated in various ventures for the betterment of portions of his community and the children whom live within it, he also perpetuated the criminal gang lifestyle and the anti-police sentiment in this country with his far-reaching song lyrics and images such as these.  The bottom line is that he chose the lifestyle that ultimately killed him and it wasn't the "great guy" lifestyle that so many ppl are making it out to be now that he's gone.
>
> View all 1,284 comments

32

COMPLAINT

62. As an example of the "images such as these" to which he referred, SGT. SYDANMAA included the following widely-circulated photo of Mr. Hussle giving the middle finger to a police car:



63. Mr. Hussle was a complicated and multifaceted public figure in Los Angeles. In recent years, he devoted much of his time, energy, fame, and wealth to community development projects, and was a positive figure to many. It is also true that the subject matter of his songs consisted primarily of descriptions of violence and drug dealing, and that his lyrics included numerous anti-police statements. For example, the introduction to one of his popular songs includes the phrase "Fuck the police!" repeated seven times. And many of his lyrics identify him as a member of the Rolling '60s Crips, and describe his gang-related actions, including violence, robberies, and drug dealing. Both perspectives on Mr. Hussle have validity, and in

our democracy a public employer may not demand that its employees assert only one side in their private off-duty speech.

64.   SGT. SYDANMAA's post drew approximately 1,300 comments.  Many of those comments were supportive of his viewpoint; many others attacked him using profanity and violent language.  SGT. SYDANMAA does not permit profanity or threats on his social media page comments, and attempts to delete such comments when he sees them.

65.   In this instance, one commenter asserted, using profanity and calling SGT. SYDANMAA a "pussy," that he did not have any basis in experience to comment about Mr. Hussle.  SGT. SYDANMAA responded that his experience consisted of working as an LAPD officer for the past 20 years in the area of the city where Mr. Hussle was killed.  Another commenter then called him a "fucking pig," a "fascist," and a "Nazi," accused him of being part of a "murdering death squad," and threatened him, telling him that he and other officers should watch their backs lest they be shot themselves when they respond to calls in the area.  The commenter wrote: "No wonder so many gangbangers want to kill y'all, y'all just shouldn't show up, for everyone's safety."

66.   SGT. SYDANMAA responded sarcastically: "Here's an idea. Next time you need help, call a Crip, not 911." SGT. SYDANMAA's response was intended to convey, and did convey, two important social-policy ideas: first, that criminal gangs in fact do *not* come to the aid of people in need, and do *not* provide safety and security to their neighborhoods; there is no gang phone number that citizens can call for assistance; second, that all people do in fact rely on the police for protection, and the police do in fact respond to all calls for emergency assistance. "Call a Crip, not 911" is a rhetorical thought experiment, asking what our

COMPLAINT

communities would be like if they were run by criminal gangs and there were no police.

67.  The sarcastic comment that people who claim to hate police should try calling criminals when they need help is an extremely common theme in social-media and other public-forum discussions of policing policy.  It's a reminder that even people who claim to hate police summon the police for help and service, and expect help and service from the police.  The policy query clearly implied is: If you hate the police and want to disband police departments, what solution do you propose to address people's need for protection and public safety?  Who will you call in an emergency if there are no police?

68.  The policy query was particularly salient to the discussion at issue, because SGT. SYDANMAA has spent two decades responding to citizens' calls for help in Mr. Hussle's neighborhood, and trying to provide protection there, and Mr. Hussle, by his own account, spent much of that same two decades committing crimes and selling drugs with a violent criminal gang, the Rolling '60s Crips.

69.  Moreover, SGT. SYDANMAA did not give up his First Amendment rights when he accepted employment with the Department.  He was entitled to respond to the commenters' comments on this important issue of public concern.  A private citizen speaking on his own time, while *off*-duty, on his own personal social media page is not and cannot be forbidden from responding to speech directed at him on a matter of concern, simply because while *on*-duty, he is employed as a police officer.

70.  The LAPD initiated its disciplinary process against SGT. SYDANMAA. SGT. SYDANMAA defended himself, asserting his constitutional right to speak while off-duty as a private citizen on matters of public concern on his private

social media account.  Nonetheless, the LAPD disciplined him on or about October 5, 2020, imposing a 1-day suspension.

71.  A public employee simply cannot be subjected to discipline or retaliation consistent with our Constitution, for the statement SGT. SYDANMAA made about Nipsey Hussle.  The LAPD cannot take the position that expression of opinions praising Mr. Hussle is allowed, but expression of opinions criticizing Mr. Hussle is prohibited and subject to discipline.  Yet that is exactly what the LAPD has done.

72.  Indeed, the LAPD Internal Affairs detective, Det. Sherri Cardona, who presented the Department's case at SGT. SYDANMAA's Board of Rights, stating that Mr. Hussle was "an inspiration to us all."  If Det. Cardona, an on-duty LAPD officer, in the course of her job duties, can state that perspective, the Constitution does not permit the LAPD from disciplining an off-duty LAPD officer, on his own time and his own personal social media account, from stating a different perspective.

**Sgt. Sydanmaa Is Harmed by the LAPD's Wrongful Actions**

73.  SGT. SYDANMAA was harmed, continues to be harmed, and will be harmed in the future by the LAPD's wrongful actions.

74.  First, SGT. SYDANMAA is harmed psychologically, reputationally, and emotionally by being formally disciplined on multiple occasions by the LAPD for expressing his views on matters of public concern in his speech as a private citizen on his personal social media accounts.

75.  SGT. SYDANMAA experiences the additional psychological and emotional harms of having his future speech chilled and deterred for as long as he remains an LAPD employee.  The LAPD's actions were a slap in the face of the Constitution, but it is SGT. SYDANMAA who feels that slap most acutely.

76.  Second, SGT. SYDANMAA's prospects for promotion and advancement with the Department are now significantly impaired because his personnel file now contains these instances of discipline for purported misconduct.  As a 23-year Department veteran with an exemplary record, SGT. SYDANMAA would likely have been promoted one or more additional times during the remaining years of his career, and retired as a Lieutenant or Captain. Such promotions will be virtually impossible with his personnel record marred by these wrongful impositions of discipline.

77.  The inability to promote and finish his career at a higher rank, with correspondingly higher pay, harms SGT. SYDAMAA economically, because his pension will be determined by his salary at the time of retirement.  The amount of this economic harm is subject to proof at trial.

78.  Additionally, SGT. SYDANMAA's post-retirement career options are significantly reduced by being unable to promote to a higher rank.  There are numerous positions available in the public and private sectors to retired Lieutenants and Captains that are not available to retired Sergeants.  The loss of these opportunities harms SGT. SYDANMAA in an amount subject to proof at trial.

79.  Finally, SGT. SYDANMAA—and all LAPD personnel—continue to be harmed by the LAPD's failure to promulgate a clear, consistent, and constitutional social media policy.  The current climate of uncertainty, and arbitrary enforcement targeting political viewpoints, chills the exercise of the constitutional rights of speech and political participation of all LAPD personnel.

80.  CHIEF MOORE ratified and personally participated in the disciplinary proceedings against SGT. SYDANMAA with respect to the statements regarding Justice Kavanaugh's accusers and Nipsey Hussle, as set forth herein. CHIEF

COMPLAINT

MOORE has final policymaking authority for the City with respect to LAPD disciplinary policies and enforcement of same.

81. The ratification and personal participation by CHIEF MOORE in the LAPD's conduct as set forth herein—deliberately targeting officers' off-duty speech for discipline and punishment based on its political viewpoint—is oppressive conduct, because it was done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity and by misuse or abuse of authority. It is therefore sufficient to support an award of punitive damages in this action. *Dang v. Cross*, 422 F.3d 800, 809 (9th Cir. 2005).

## CLAIMS FOR RELIEF

### First Claim For Relief

### Retaliation Based on Exercise of Right to Free Speech in Violation of 42 U.S.C. § 1983

### (Against All Defendants)

82. SGT. SYDANMAA re-alleges and incorporates by reference as if fully set forth herein all preceding paragraphs of this Complaint.

83. SGT. SYDANMAA engaged in constitutionally protected activity when he spoke as a private citizen on matters of public concern, on his personal social media accounts.

84. As a result of his constitutionally protected activity, SGT. SYDANMAA was subjected to adverse action by DEFENDANTS that would chill a person of ordinary firmness from continuing to engage in that protected activity, when DEFENDANTS charged him with misconduct and imposed official discipline on him.

COMPLAINT

85.  There was a substantial causal relationship between the constitutionally protected activity and the adverse action taken against SGT. SYDNAMAA by DEFENDANTS, because DEFENDANTS directly and expressly punished him for his constitutionally protected activity.

86.  DEFENDANTS developed and maintained policies and customs that violated SGT. SYDANMAA's constitutional rights. CHIEF MOORE acted as the final policymaking authority with respect to the imposition of discipline on SGT. SYDANMAA. DEFENDANTS ratified, endorsed, and abetted CHIEF MOORE's retaliatory decisions and actions, and the basis for them. DEFENDANTS knew of, ratified, and failed to stop, the imposition of discipline against SGT. SYDANMAA for exercising his First Amendment rights.

87.  As a direct result of SGT. SYDANMAA's exercising his constitutional right to speak publicly—on his own time, off-duty, as a citizen—publicly on matters of public concern, DEFENDANTS retaliated against him, including, inter alia, taking adverse employment actions against him, by disciplining him for the content and/or viewpoint of his speech. Absent SGT. SYDMAA's exercising his constitutionally protected rights to speak, DEFENDANTS would not have taken the adverse employment actions against him set forth herein.

88.  At all times mentioned herein, SGT. SYDANMAA's constitutionally protected activities were related to matters of public concern, and were not undertaken pursuant to job duties. SGT. SYDANMAA's speech was on matters of widely-debated public concern.

89.  By taking adverse employment actions against SGT. SYDANMAA that were substantially motivated by his constitutionally protected speech, DEFENDANTS violated SGT. SYDANMAA's rights under the First Amendment to the United State Constitution.

90.  DEFENDANTS' official custom, pattern and practice of retaliating against police officers for the content and viewpoint of their off-duty, private-citizen speech on matters of public concern, has a continued chilling effect upon SGT. SYDANMAA's speech activities and those of many of his fellow officers. DEFENDANTS' adverse employment actions were intended to, did, and would reasonably chill and deter SGT. SYDANMAA, other officers, and other City employees from speaking publicly, on their own time, on matters of public concern, out of fear that if they expressed certain political views or opinions as citizens, they may be punished as City employees.

91.  As a direct result of DEFENDANTS' acts and omissions, SGT. SYDANMAA has suffered significant damages in an amount subject to proof at trial, including psychological and emotional harms; reputational harms; lost promotional opportunities and associated lost wages and pension income; and lost future income from post-retirement private-sector employment opportunities that will be unavailable to him because he now has an adverse disciplinary record with the Department.

92.  As a direct, foreseeable and proximate result of DEFENDANTS' acts and omissions, SGT. SYDANMAA suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to his damage, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

93. In performing the acts herein alleged, DEFENDANTS acted intentionally to injure SGT. SYDANMAA, namely, to discipline him and adversely affect his employment, because of the content and viewpoint of his constitutionally protected speech on matters of public concern, which he engaged in while off duty, as a citizen.

94. DEFENDANTS' conduct was oppressive, despicable and performed with a willful, conscious, and reckless disregard of SGT. SYDANMAA's civil rights such that punitive or exemplary damages are warranted.

**Second Claim for Relief**

**Injunctive Relief**

**(Against All Defendants)**

95.  SGT. SYDANMAA re-alleges every preceding and succeeding paragraph of this complaint as though fully set forth herein.

96.  SGT. SYDANMAA engaged in constitutionally protected activity when he spoke as a private citizen on matters of public concern, on his personal social media accounts.

97.  As a result of his constitutionally protected activity, SGT. SYDANMAA was subjected to adverse action by Defendants that would chill a person of ordinary firmness from continuing to engage in that protected activity, when Defendants charged him with misconduct and imposed official discipline on him.

98.  There was a substantial causal relationship between the constitutionally protected activity and the adverse action taken against SGT. SYDNAMAA by Defendants, because Defendants directly and expressly punished him for his constitutionally protected activity.

99.  DEFENDANTS developed and maintained, and continue to maintain, policies and customs that violated SGT. SYDANMAA's constitutional rights. CHIEF MOORE acted and continues to act as the final policymaking authority with respect to the imposition of discipline on SGT. SYDANMAA. DEFENDANTS ratified, endorsed, and abetted CHIEF MOORE's retaliatory decisions and actions, and the basis for them. DEFENDANTS knew of, ratified,

COMPLAINT

and failed to stop, the imposition of discipline against SGT. SYDANMAA for exercising his First Amendment rights.

100.    As a direct result of SGT. SYDANMAA's exercising his constitutional right to speak publicly—on his own time, off-duty, as a citizen—publicly on matters of public concern, DEFENDANTS retaliated against him, including, inter alia, taking adverse employment actions against him, by disciplining him for the content and/or viewpoint of his speech. Absent SGT. SYDANMAA's exercising his constitutionally protected rights to speak, DEFENDANTS would not have taken the adverse employment actions against him set forth herein.

101.    At all times mentioned herein, SGT. SYDANMAA's constitutionally protected activities were related to matters of public concern, and were not undertaken pursuant to job duties. SGT. SYDANMAA's speech was on matters of widely-debated public concern.

102.    By taking adverse employment actions against SGT. SYDANMAA that were substantially motivated by his constitutionally protected speech, DEFENDANTS violated SGT. SYDANMAA's rights under the First Amendment to the United State Constitution.

103.    DEFENDANTS' official custom, pattern and practice of retaliating against police officers for the content and viewpoint of their off-duty, private-citizen speech on matters of public concern, has a continued chilling effect upon SGT. SYDANMAA's speech activities and those of many of his fellow officers. DEFENDANTS' adverse employment actions were intended to, did, and would reasonably chill and deter SGT. SYDANMAA, other officers, and other City employees from speaking publicly, on their own time, on matters of public concern, out of fear that if they expressed certain political views or opinions as citizens, they may be punished as City employees.

104.     As a direct result of DEFENDANTS' acts and omissions, SGT. SYDANMAA has suffered significant damages in an amount subject to proof at trial, including psychological and emotional harms; reputational harms; lost promotional opportunities and associated lost wages and pension income; and lost future income from post-retirement private-sector employment opportunities that will be unavailable to him because he now has an adverse disciplinary record with the Department.

105.     As a direct, foreseeable and proximate result of DEFENDANTS' acts and omissions, SGT. SYDANMAA suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to his damage, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

106.     In performing the acts herein alleged, DEFENDANTS acted intentionally to injure SGT. SYDANMAA, namely, to discipline him and adversely affect his employment, because of the content and viewpoint of his constitutionally protected speech on matters of public concern, which he engaged in while off duty, as a citizen.

107.     DEFENDANTS' actions are ongoing and likely to recur.  SGT. SYDANMAA is entitled to injunctive relief under 42 U.S.C. § 1983 to remedy present injuries prevent continuing injuries.  Accordingly, SGT. SYDANMAA is entitled to, and hereby requests, that the Court enter an appropriate injunction requiring, inter alia, that the Department (1) purge SGT. SYDANMAA's personnel file of all disciplinary actions based on the unconstitutional punishment of protected speech as set forth herein; and (2) implement a policy governing officers' personal social media use that is consistent with the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgment against DEFENDANTS for:

1. Compensatory damages, economic and non-economic damages in excess of $1,000,000, in an amount according to proof;

2. General damages to compensate SGT. SYDANMAA for mental and emotional injuries, distress, anxiety, and humiliation;

3. Attorneys' fees pursuant to 42 U.S.C. § 1988;

4. Exemplary or punitive damages as to DEFENDANT MOORE, in an amount according to proof that is sufficient to punish and prevent future violations of constitutional rights;

5. Injunctive relief as set forth herein;

6. Costs of suit;

7. Post-judgment interest;

8. Such additional relief as the Court may deem proper.

DATED:  Nov. 16, 2020                    Respectfully submitted,
                                         WERKSMAN JACKSON & QUINN LLP

                        By:

                                         CALEB E. MASON
                                         Attorneys for Plaintiff
                                         Joel Sydanmaa

COMPLAINT

## DEMAND FOR JURY TRIAL

SGT. SYDANMAA demands a jury trial.

DATED:  Nov. 16, 2020                 Respectfully submitted,

                                                    WERKSMAN JACKSON & QUINN LLP

                        By:


                                                    CALEB E. MASON
                                                    Attorneys for Plaintiff
                                                    Joel Sydanmaa

COMPLAINT